WOOD, Chief Judge.
During the summer of 2008, David Res-nick, a long-haul truck driver, took T.M., the nine-year-old son of family friends, on a cross-country work trip that was supposed to end at Disneyland. They never got there. Instead, they traveled to Washington State and back to Indiana. Over the two-week trip, Resnick sexually abused T.M. repeatedly. Eventually, T.M. told his parents about Resnick’s conduct and Res-nick was charged with a variety of child-abuse and firearms offenses. After a four-day trial, a jury convicted Resnick on all four counts.
Resnick challenges his convictions on three bases. He argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he was guilty of the charge of brandishing a firearm. He also contends that his remaining convictions should be reversed because the district court erred in admitting testimony of a second minor victim and in allowing testimony and argument about Resnick’s refusal to take a polygraph. Ultimately, all of Resnick’s arguments fail. With respect to the references to a polygraph (that never occurred), however, we stress that our result is heavily influenced by the fact that we are reviewing only for plain error. See United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed.R.Crim.P. 52(b). This evidence, to the extent it is admissible at all, must be used with great caution. Resnick, however, forfeited his objection to this evidence at trial, and because we find no plain error, we affirm.
I
In 2008, T.M. was nine years old and lived in Indiana with his mother and stepfather. Resnick was a friend of the family who sometimes took T.M. and his siblings to dinner or gave them gifts. In July 2008, T.M.’s parents allowed him to accompany Resnick on a two-week, cross-country work trip. T.M. believed that they would go to Disneyland, and that it would be his job to care for Resnick’s puppy.
T.M. was badly mistaken. Throughout the trip, Resnick sexually abused him, subjecting him to pornography, sexual touching, oral sex, and forcible sodomy. One night, as they were traveling through Washington, Resnick drove by a weigh station without stopping. Washington State Patrol Officer Lace Koler pulled over Resnick’s rig. Before Koler walked up to the truck, Resnick put a pistol against T.M.’s head. “If you tell anybody,” Resnick said, “I will kill you and your family.” T.M. kept silent. Resnick and T.M. returned to Indiana, and T.M. went home. At that time, he told no one about the abuse he experienced on the trip.
Some time after they returned, Resnick invited T.M. and his friend K.M. to a “pool party” at a local Comfort Inn. K.M. was eight years old. There were no other children at the party, and the two boys were to spend the night alone with Res-nick in the hotel. Knowing what was in store, T.M. fought with K.M. and threw a cell phone against the wall. He was sent home, leaving K.M. alone with Resnick. Over the course of the night, Resnick showed K.M. a firearm and allowed him to hold it. They slept in the same bed, and Resnick sexually abused K.M. When K.M. returned home, he initially did not tell his mother what Resnick had done to him. But that November, he confided in her, and she called the police.
*892 In April 2011, law enforcement personnel searched Resnick’s house in Florida. They found more than 66 hours of video of minors being sexually abused or exploited. Among the items seized was a laptop that T.M. later identified as the one Resnick brought on their 2008 trip. During the execution of the search warrant, Resnick was interviewed by FBI Special Agents Matt Chicantek and Lana Sabata. Chican-tek asked Resnick about T.M. and K.M.’s accusations of abuse.
At first, Resnick said that he did not know T.M. and K.M. at all. Then he backpedaled with a denial of any inappropriate behavior. He stated that he could not remember a traffic stop in Washington on his 2008 trip with T.M., and denied staying overnight alone with K.M. at the hotel. He also denied having carried a firearm since his felony conviction in 2000. When Chicantek asked Resnick whether he would be willing to take a polygraph exam, Resnick demurred, saying he would havé to talk to a lawyer first and noting that polygraph exams were unreliable. Resnick was later arrested and indicted in the Southern District of Florida for possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). He pleaded guilty.
At the same time, Resnick was indicted in the Northern District of Indiana on charges related to his abuse of T.M. The Indiana charges included aggravated sexual abuse of a minor, interstate transportation of child pornography, brandishing a firearm in furtherance of a crime of violence, and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 2241(c), 2252(a)(1), 924(c)(l)(A)(ii), and 922(g)(1).
Resnick elected to go to trial on the Indiana charges. Before trial, the government gave notice that it intended to proffer evidence of Resnick’s abuse of K.M. Resnick filed a motion in limine to exclude that evidence. The district court denied Resnick’s motion, finding the evidence admissible under Rules 414 and 403 of the Federal Rules of Evidence.
Resnick chose not to take the stand at trial. On the third day of the trial, the government introduced evidence during its direct examination of Agent Chicantek that Resnick had denied any abuse of T.M. or K.M. and had declined to take a polygraph. Resnick’s counsel did not object. On cross-examination, Resnick’s counsel asked Chicantek if Resnick had sought an attorney during the interview. Chicantek replied that the only time Resnick mentioned a lawyer was when he said that, “before he took a polygraph he would want to consult with an attorney.” Later during cross-examination, Resnick’s counsel also noted, through a leading question, that Resnick had said that he wanted to speak with a lawyer before taking a polygraph exam. On redirect, Chicantek stated that Resnick had said that he did not want to take the polygraph because “everyone knows that whoever is operating the polygraph machine can manipulate it to say whatever they want to say or the results to be whatever they want them to be.” Chi-cantek also noted that, to his knowledge, Resnick never took a polygraph examination. During their closing arguments, the government and Resnick’s counsel each made one reference to Resnick’s refusal to take a polygraph.
The jury convicted Resnick on all four counts. The district court sentenced him to life imprisonment, plus a mandatory consecutive seven-year sentence for the brandishing count. It entered judgment and sentence that day. Resnick filed a timely notice of appeal.
II
Resnick contends that the government presented insufficient evidence to convict *893 him of the brandishing count. He argues that his remaining convictions should be reversed because the district court erred by admitting evidence of his abuse of K.M. and by admitting evidence that he refused to take a polygraph examination.
A
We first consider Resnick’s attack on the sufficiency of the evidence supporting the conviction for brandishing a weapon in violation of 18 U.S.C. § 924(c)(1)(A)(ii). He faces a difficult standard of review, under which we ask only whether, “viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court must “give[ ] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Id.
In relevant part, section 924(e)(l)(A)(ii) punishes any person who, “during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States ... uses or carries a firearm” and “brandish[es]” it in furtherance of the crime. Section 924(c)(1)(A)(ii)’s “brandishing” is a fact that increases the minimum penalty for the crime, and therefore “is an ‘element’ that must be submitted to the jury and found beyond a reasonable doubt.” Alleyne v. United States, — U.S. —, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013).
The government had to prove that Resnick committed a crime of violence and that he knowingly brandished a firearm during and in relation to the crime. See United States v. Castillo, 406 F.3d 806, 812 (7th Cir.2005). Resnick accepts that the underlying crime of violence was proved beyond a reasonable doubt. See United States v. Munro, 394 F.3d 865, 870 (10th Cir.2005) (sexual abuse of a minor is a crime of violence). He also concedes that there was sufficient evidence for the jury to find beyond a reasonable doubt that Resnick “threatened [T.M.] to prevent him from complaining to Officer Koler and that in doing so he used some object that he wanted [T.M.] to believe was a gun.” But, Resnick says, the evidence was insufficient to prove that that object actually was a gun.
Resnick contends that the government’s proof was inadequate because T.M. was the only witness to the brandishing and was not sure that he saw a gun. The fact that there were no other witnesses, however, is beside the point: one eyewitness is sufficient to prove a crime beyond a reasonable doubt. United States v. Payton, 328 F.3d 910, 911 (7th Cir.2003).
Resnick overstates the case when he complains of T.M.’s alleged uncertainty. In his testimony, T.M. confirmed many times that Resnick had used a gun to threaten him. T.M. saw the gun well enough to be able to draw a picture of it. He identified a photograph of the model of gun he believed Resnick had used and specified that it was a “German Luger.” He was also able to pinpoint where the gun was located in the truck cab. Additionally, Tim Podgorski, Victor Savia, Byron Owen, Rocco Rigsby, and K.M. all testified that they regularly saw Resnick with guns. Podgorski and Owen added that Resnick took guns on work trips. Podgorski testified that he had seen a thin-barreled Luger in Resnick’s father’s shop that was similar to the one that T.M. drew.
Resnick makes much of two moments during T.M.’s testimony when T.M. ex *894 pressed a bit of uncertainty. On direct examination, the prosecutor asked T.M., “As you sit here today, do you know what kind of gun it was that David put up against your head?” T.M. answered, “Not exactly, no.” The government then asked T.M., “Are you sure it was a gun?” T.M. responded, “Pretty sure, ma’am.” Similarly, while asking how well T.M. saw the gun during the brandishing on cross-examination, defense counsel asked, “So you never saw the gun, did you?” T.M. responded, “Not a hundred percent.”
In order for this testimony to be sufficient to sustain Resnick’s conviction, T.M. need not be metaphysically positive that Resnick was using a gun. See United States v. Moore, 572 F.3d 334, 337 (7th Cir.2009) (noting that in circumstantial cases “guilty verdicts rest on judgments about probabilities” (quoting Stewart v. Coalter, 48 F.3d 610, 614 (1st Cir.1995))). The government was not required to prove that the object—which T.M. saw, drew, identified, and felt as a gun while being threatened—was not something other than a gun. See Jackson, 443 U.S. at 326, 99 S.Ct. 2781 (prosecution does not have an “affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt”); Harmon v. McVicar, 95 F.3d 620, 623 (7th Cir.1996) (“The State need not exclude every reasonable hypothesis of innocence.”). Finally, Resnick’s characterization of T.M.’s “pretty sure” as an equivocation demonstrates why reviewing courts must leave inferences based on witness demeanor to the trier of fact. See United States v. Woody, 55 F.3d 1257, 1264 (7th Cir.1995). Depending on T.M.’s inflection, “pretty sure” could have denoted hesitation, great certainty, or something in between. It was reasonable to infer that the object T.M. said he was “pretty sure” was a gun was actually a gun—and it was an inference for the jury to make.
Similarly, T.M.’s “not a hundred percent” on cross-examination could, in context, just as easily be interpreted as describing how much of the gun he saw, rather than his certainty that it was a gun. And just because someone is not one hundred percent sure does not mean that he or she is unsure—few things in life are one hundred percent certain. In any event, T.M. clearly believed he was threatened with a gun. Evaluating T.M.’s credibility was the jury’s prerogative. See United States v. Patterson, 23 F.3d 1239, 1244-45 (7th Cir.1994). Together with testimony that Resnick habitually carried a gun on work trips, T.M.’s testimony made the jury’s inference that the object Res-nick brandished while threatening T.M. was a gun “sufficiently strong to avoid a lapse into speculation.” Moore, 572 F.3d at 337. The evidence at trial was sufficient to support Resnick’s conviction for brandishing a firearm during a crime of violence.
B
Resnick next contends that the district court misinterpreted Federal Rule of Evidence 414 to create a presumption of admissibility, and that it abused its discretion under Rule 403 in admitting K.M.’s testimony that Resnick abused him. We review the district court’s interpretation of the rules of evidence de novo, United States v. Schmitt, 770 F.3d 524, 530 (7th Cir.2014), and its evidentiary rulings for abuse of discretion. Id. at 532.
Rule 414(a) states that “evidence of the defendant’s commission of another offense ... of child molestation” is admissible “in a criminal case in which the defendant is accused of an offense of child molestation.” United States v. Miller, 688 F.3d 322, 327 (7th Cir.2012) (quoting Fed. R.EviD 414(a)). The district court must conduct a two-step inquiry in evaluating evidence under Rule 414. First, it must *895 decide whether the evidence falls under that rule. Then it must turn to Rule 403 and “assess the risk of unfair prejudice” the evidence poses. Id. This inquiry is required because “[e]ven if the evidence does not create unfair prejudice solely because it rests on propensity, it may still risk a decision on the basis of something like passion or bias — that is, an improper basis.” Id. (quoting United States v. Rogers, 587 F.3d 816, 822 (7th Cir.2009)). Rule 414 therefore confers no presumption of admissibility. See Rogers, 587 F.3d at 822 (explaining that Rule 413 does not “reverse” a presumption against admissibility because Rule 404(b) does not create a presumption against admissibility, but rather bars certain inferences).
The district court’s opinion stated: “RULE 414 trumps the restriction in RULE 404(b) by creating a presumption in favor of admitting propensity evidence.” This statement was erroneous, but we conclude that the error was harmless. There is no evidence that the district court in fact applied a presumption of admissibility in evaluating the evidence. Instead, it specifically noted that it had to “carefully consider” whether the evidence “should be excluded pursuant to Rule 403.” It conducted this inquiry dutifully.
The district court found K.M.’s testimony highly probative. It correctly noted that Resnick’s sexual abuse of K.M. constituted another “act of child molestation” under Rule 414. It stated that “there is no doubt that the alleged act against [K.M.] is relevant because [it is] indicative of a propensity to commit the act charged involving [T.M.].” The district court also noted that Congress had found that “in child molestation cases ... a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant ... that simply does not exist in ordinary people.” United States v. Hawpetoss, 478 F.3d 820, 824 n. 7 (7th Cir.2007).
Later, the district court weighed the risk that the testimony would result in unfair prejudice against Resnick. It noted that “all child abuse and molestation is extremely disturbing, but speaking in relative terms, the alleged incident that K.M. will testify about is mild in comparison to [T].M.’s expected testimony concerning the same charge at issue.” The court therefore concluded that the risk of unfair prejudice in admitting K.M.’s testimony was not too high. This line of reasoning is well-established. See, e.g., United States v. Scop, 940 F.2d 1004, 1009 (7th Cir.1991) (holding “evidence ... was not unduly prejudicial” because “[i]t concerned truly similar activities rather than inflammatory criminal acts”). The court also observed that uncharged molestation evidence is generally admitted under Rule 403 even when similar to the charged conduct. See United States v. Roux, 715 F.3d 1019, 1026 (7th Cir.2013) (collecting cases).
Resnick also argues that the district court should have issued a contemporaneous instruction limiting KM.’s testimony to the “relevant testimony [he had] to offer on subjects other than propensity.” But Resnick did not request any such instruction at the time, nor did he object to the eventual instruction at trial. We thus review this point only for plain error. United States v. Reese, 666 F.3d 1007, 1016 (7th Cir.2012).
There is no rule requiring the court to give even an unsolicited limiting instruction when potentially prejudicial testimony is offered. See United States v. Papia, 560 F.2d 827, 840 (7th Cir.1977) (timing of limiting instruction is left to “sound discretion of the trial judge”). Resnick argues that the eventual instruction was “long, multifaceted, and difficult *896 to understand,” but he does not say how or why. Neither does he indicate how K.M.’s testimony should have been limited. In any event, because the testimony was properly admitted for any purpose, no limiting instruction was required. See United States v. Wilson, 31 F.3d 510, 515 (7th Cir.1994) (lack of limiting instruction not abuse of discretion where evidence properly admitted). The district court’s decision to give its instruction at the close of evidence was not an abuse of discretion, let alone plain error.
C
Finally, we come to the most troublesome issue on this appeal: the district court’s decision to admit evidence that Resnick refused to take a polygraph exam. Because Resnick did not contemporaneously object to the evidence at trial, we review this decision for plain error. Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). In order to qualify as “plain error,” the error must be plain and “affect[] substantial rights.” United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting Fed.R.Crim.P. 52(b)). An error is not plain “unless [it] is clear under current law” and not “subject to reasonable dispute.” Id. at 734, 113 S.Ct. 1770. And while the reviewing court has discretion to correct such an error, it “should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings.” Id. at 732, 113 S.Ct. 1770 (internal quotation marks omitted).
Resnick contends that it was plain error to admit evidence of his refusal to take a polygraph exam because the technique is fundamentally untrustworthy. His argument seems to be that, given the unreliability of the technique and the ease of manipulation, his refusal has no probative value. Essentially, he seems to say, the police might as well have asked him if he would submit to a horoscope or a tarot reading. But while little prejudice (in most circles) would attach to someone who declined examination using those techniques, a jury may believe that a person who refuses to take a polygraph has something to hide.
Polygraph evidence has faced sharp criticism, largely because of serious doubts about its scientific or probative value. See, e.g., United States v. Scheffer, 523 U.S. 303, 309, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (“[T]here is simply no consensus that polygraph evidence is reliable.... [T]he scientific community remains extremely polarized about the reliability of polygraph techniques.”); United States v. Lea, 249 F.3d 632, 639 (7th Cir.2001) (noting that, despite their discretion, “ ‘district judges often exclude! ] such evidence ‘because doubts about the probative value and reliability of this evidence’ outweigh[ ] any rationale for admission’ ” (quoting United States v. Dietrich, 854 F.2d 1056, 1059 (7th Cir.1988))); United States v. Dingo, 609 F.3d 904, 908 (7th Cir.2010) (noting that an “offer of a willingness to submit to a polygraph ‘is so unreliable and self-serving as to be devoid of probative value’ ” (quoting United States v. Bursten, 560 F.2d 779, 785 (7th Cir.1977)); United States v. Rodriguez-Berrios, 573 F.3d 55, 73 (1st Cir.2009) (holding that “[p]olygraph results are rarely admissible” because they have “long been considered of dubious scientific value” (quotation and citation omitted))); United States v. Gill, 513 F.3d 836, 846 (8th Cir.2008) (dubbing polygraph evidence “disfavored”).
Several of our sister circuits have taken the step of adopting a per se rule excluding polygraph evidence. See, e.g., United States v. Sanchez, 118 F.3d 192, 197 (4th Cir.1997) (en banc); Rothgeb v. United *897 States, 789 F.2d 647, 651 (8th Cir.1986); United States v. Russo, 796 F.2d 1443, 1453 (11th Cir.1986). They have done so out of a concern that there is no reliable way for the district courts to separate sound polygraph results from unreliable ones. They also note, with good reason, that polygraph evidence entails a significant possibility of unfair prejudice. The Supreme Court has recognized that “the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilt.” Scheffer, 523 U.S. at 314, 118 S.Ct. 1261. The danger of prejudice is especially high given that “a judge cannot determine, when ruling on a motion to admit polygraph evidence, whether a particular polygraph expert is likely to influence the jury unduly.” Id.
It is thus no surprise that our decisions have, in practice, pointed in only one direction: affirming the exclusion of polygraph evidence. There is no scientific consensus that polygraph testing is reliable, and there is a significant possibility of unfair prejudice if it is introduced into evidence at trial.
That said, we have not yet adopted a blanket rule excluding the use of polygraph evidence in federal prosecutions. Given the standard of review, this case is not the right one in which to take that step. We have given district courts “considerable deference” on the issue, indicating that the decision to admit polygraph evidence “will be reversed only when the district court has abused its discretion.” United States v. Ross, 412 F.3d 771, 773 (7th Cir.2005) (quoting United States v. Lea, 249 F.3d 632, 638 (7th Cir.2001)). This alone makes it inappropriate for us to say that it was plain error to admit evidence related to a polygraph in the absence of some extraordinary reasons not suggested here. Olano, 507 U.S. at 732, 113 S.Ct. 1770 (error not plain “unless [it] is clear under current law”). The law is not settled, and the case against Resnick was airtight. Moreover, this case is not in the end about polygraph evidence: it is about evidence of a refusal to take a polygraph.
But the latter point moves us from one problem to another one with constitutional overtones. Agent Chiean-tek’s testimony did not describe the result of a polygraph test; he instead revealed that Resnick had refused to take the test before talking to a lawyer. A polygraph examination is almost always a custodial interrogation. See Oregon v. Elstad, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (Miranda rights attach in custodial setting). Therefore, “absent a waiver of [Fjifth [A]mendment rights, a person may not be compelled to submit to a polygraph examination.” Garmon v. Lumpkin Cnty., Ga., 878 F.2d 1406, 1410 (11th Cir.1989). Because a criminal defendant’s constitutionally protected silence may not be used against her, the “natural corollary to that rule” is that generally “a defendant’s refusal to submit to a polygraph examination cannot be used as incriminating evidence.” Id.; see also United States v. St. Clair, 855 F.2d 518, 523 (8th Cir.1988) (noting, without stating grounds, that “[t]he Eighth Circuit has held it is improper for a witness to testify whether or not a criminal defendant refused to submit to a polygraph test”).
Resnick was interviewed during the execution of a search warrant on his home. The officers read him his Miranda rights before questioning him. Generally, a criminal defendant’s silence after he has been read his Miranda rights may not be introduced against him at trial. See Doyle v. Ohio, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). But Resnick was not silent. He gave exculpa *898 tory answers to a number of questions. Then, when asked whether he would take a polygraph, Resnick said that he wanted to consult with an attorney first. The fact that Resnick gave exculpatory answers before declining the polygraph complicates matters. In a noncustodial setting, where a “defendant starts down an exculpatory path” and then refuses to expand on those statements, the use of his later silence at trial does not violate the Fifth Amendment. See United States v. Bonner, 302 F.3d 776, 783-84 (7th Cir.2002) (citing United States v. Davenport, 929 F.2d 1169, 1174 (7th Cir.1991)). Since the interaction between Resnick and the officers appears to have been voluntary up to the point when the polygraph issue came up, this rule might apply. On the other hand, Resnick’s refusal to take a polygraph was not selective silence in response to specific questions. Rather, it was a wholesale refusal to answer questions in a particular setting. Under these circumstances, Res-nick’s refusal to submit to a polygraph resists easy Fifth Amendment categorization.
Ultimately, however, the proper characterization does not matter here. A Fifth Amendment self-incrimination violation is not structural error. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding Fifth Amendment self-incrimination error not grounds for reversal of conviction if proven harmless “beyond a reasonable doubt”); United States v. Jumper, 497 F.3d 699, 703 (7th Cir.2007) (same). Thus, if the district court committed Fifth Amendment error (a question we need not decide), we must still decide whether any such error was “plain.” We have never before held that the refusal to take a polygraph implicates the Fifth Amendment. Moreover, Resnick’s refusal to take a polygraph was mentioned only once by each side during closing, the evidence against him was very strong, and his defense did not depend on his credibility because he did not take the stand at trial. It is Resnick’s burden to “make a specific showing of prejudice” in order to satisfy the “substantial rights” part of the plain error analysis. Olano, 507 U.S. at 735, 113 S.Ct. 1770. He has not done so. The dissent overstates matters when it says, post at 902, that “only an innocent defendant could have his conviction reversed” under the approach to plain error we have taken. Any defendant who can point to an error that affected his “substantial rights” (and the other criteria of Olano) can show plain error. Resnick’s problem is that any error in admitting the testimony about his reluctance to submit to a polygraph was not plain and did not affect his substantial rights in light of the record as a whole. It therefore does not support reversal of his conviction.
Ill
The evidence at trial was sufficient to sustain Resnick’s brandishing conviction. The district court did not abuse its discretion in admitting KM.’s testimony, nor did it commit plain error in the timing or content of its instruction limiting that testimony. Finally, the admission of testimony revealing that Resnick refused to submit to a polygraph was not plain error. The judgment of the district court is therefore AFFIRMED.